1  
2  
3  
4  
5  
6  

Dan Stormer, Esq. [S.B. # 101967]
Brian Olney, Esq. [S.B. #298089]
Rebecca Brown, Esq. [S.B. #336638]
HADSELL STORMER RENICK & DAI LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile:  (626) 577-7079
Emails: dstormer@hadsellstormer.com
        bolney@hadsellstormer.com
        rbrown@hadsellstormer.com

7  
8  

Attorneys for Plaintiffs
TERESA GARCIA, RODOLFO GARCIA, and LEXY GARCIA

9  
10  
11  
12  

**UNITED STATES DISTRICT COURT**

13  

**CENTRAL DISTRICT OF CALIFORNIA**

14  
15  
16  
17  
18  

TERESA GARCIA, individually and as surviving heir and successor in interest of ABEL GARCIA (deceased), RODOLFO GARCIA, individually and as surviving heir and successor in interest of ABEL GARCIA (deceased), and LEXY GARCIA, individually and as surviving heir and successor in interest of ABEL GARCIA (deceased),

19  
20  

Plaintiffs,

v.

21  
22  

COUNTY OF LOS ANGELES; and DOES 1- 20.

23  

Defendants.

Case No.: 2:24-cv-2492

**COMPLAINT FOR DAMAGES:**

1. 42 U.S.C. § 1983 (Eighth Amendment) – Deliberate Indifference to Serious Medical Need
2. 42 U.S.C. § 1983 (Eighth Amendment) – Failure to Protect from Harm
3. 42 U.S.C. § 1983 (Fourteenth Amendment) – Deprivation of Rights of Plaintiff to Familial Relationship with Decedent
4. 42 U.S.C. § 1983 (Eighth and Fourteenth Amendments) – *Monell* Liability
5. Cal. Code Civ. Proc. § 377.60 – Wrongful Death
6. Cal. Govt Code § 845.6 – Failure to Summon Medical Care
7. Cal. Civ. Code § 52.1 – Bane Act
8. Negligence

**[DEMAND FOR JURY TRIAL]**

24  
25  
26  
27  
28

**INTRODUCTION**

1.      On April 26, 2023, deputies with the Los Angeles Sheriff's Department ("LASD") gathered outside the cell of Abel Garcia—who had a known history of heart problems—and verbally berated him as he exhibited the common symptoms of a major heart attack and begged the deputies not to let him die. It was not until Mr. Garcia fell over and became nonresponsive that the deputies finally summoned medical care. It was too late, and Mr. Garcia was pronounced dead that same day. He leaves behind his mother and two children—Plaintiffs Teresa Garcia, Rodolfo Garcia, and Lexy Garcia—who bring this lawsuit seeking justice and accountability for the tragic and avoidable death of their son and father.

2.      LASD runs the largest jail system in the country and leads the country in in-custody deaths. Throughout 2023, on average, approximately 13,200 people were incarcerated in the Los Angeles County jail system on any given day. Nearly one-third (approximately 4,000) of these people were incarcerated at Men's Central Jail in downtown Los Angeles. LASD receives a budget of $967,000,000 to run this massive jail system just for the 2023-2024 fiscal year.

3.      Despite its immense resources, Defendant County of Los Angeles has abysmally and routinely failed to uphold its obligations under the Eighth Amendment to the United States Constitution, which prohibits cruel and unusual punishment. Defendant's failure to attend to the serious medical needs of the people in its custody had led to an unprecedented crisis and a surge in in-custody deaths.

4.      Between 2019 and 2023, 231 people died in the custody of LASD, including 45 people in 2023 alone.

5.      Many factors have been cited by incarcerated and formerly incarcerated individuals, advocates, and researchers as contributing to the current crises of in-custody deaths in Los Angeles, including nonexistent or inadequate access to healthcare, LASD's failure to intervene in violence, overcrowding, inhumane conditions, and LASD's use of force against inmates.

COMPLAINT FOR DAMAGES                    -1-

6.      As these alarming statistics demonstrate, Defendant County of Los Angeles and LASD have long been on notice of the dire and deadly conditions in their jails. One of Defendant County of Los Angeles's own jail healthcare workers recently called the conditions of the county jails a daily "human rights disaster."[1] Dozens of grieving families have sued Defendant County of Los Angeles for violations of federal and state law seeking justice and accountability after their loved ones died while in the custody of LASD due to avoidable delays in the receipt of medical care or the denial of any medical care at all. Courts and international, federal, and local agencies, including the United Nations and the United States Department of Justice, have investigated and monitored the dismal conditions at Los Angeles County jails. County agencies have received hundreds of complaints from incarcerated people and their families regarding delays or denials of medical care and inhumane treatment by jail staff. A recent study of in-custody deaths in the Los Angeles County jails found "issues of . . . healthcare access" and confirmed that "deputies and carceral staff appear to have neglected the medical or psychiatric needs of incarcerated people."[2]

7.      Defendant County of Los Angeles has admitted that Men's Central Jail "consistently ranks among the ten worst facilities in the country."[3] In 2020, Defendant County of Los Angeles' Board of Supervisors relied upon "well-documented" evidence of "the county's inability to provide appropriate medical and mental health care,

---

[1] Emily Elena Dugdale & Robert Garrova, *Daily 'Human Rights Disaster': A Jail Medical Staff Outraged by Jail Conditions and the Doctor in Charge,* LAIST, May 2, 2022, available at https://laist.com/news/criminal-justice/los-angeles-county-jail-medical-staff-outraged-by-jail-conditions.

[2] Nicholas Shapiro & Terence Keel, *Naturalizing Unnatural Death in Los Angeles County Jails*, 38 MED. ANTHROPOLOGY Q. 6 (2023), available at https://anthrosource.onlinelibrary.wiley.com/doi/10.1111/maq.12819?af=R#:~:text=We%20-found%20mental%20health%20issues,also%20tracked%20across%20other%20factors.

[3] Hilda L. Solis & Sheila J. Kuehl, DEVELOPING A PLAN FOR CLOSING MEN'S CENTRAL JAIL AS LOS ANGELES COUNTY REDUCES RELIANCE ON INCARCERATION (July 7, 2020), available al https://file.lacounty.gov/SDSInter/bos/supdocs/146991.pdf.

programming, recreation, and humane living conditions," and voted to permanently close Men's Central Jail within one year.[4]

8.      Even though the crisis in its jails is well known, Defendant County has refused to address the problem. Men's Central Jail remains open nearly four years after the Board of Supervisors voted to close it, and people incarcerated by LASD at this and other county jails continue to die at astonishing rates.

9.      On April 26, 2023, Abel Garcia became LASD's eleventh victim to die while in custody that year.

10.     Abel Garcia had been in LASD's custody since May 28, 2022. He had a documented recent history of high blood pressure and heart problems that were well known to Defendant County of Los Angeles. At the time of his death, he was incarcerated at Men's Central Jail.

11.     In the evening of April 26, 2023, Mr. Garcia's cellmates observed him exhibiting symptoms of serious medical distress and a likely cardiac event, including hyperventilation, chest palpitations, pale skin, and dilated eyes. Mr. Garcia's cellmates and men in nearby cells called out for medical attention for Mr. Garcia. After a significant period of time, a custody assistant finally came to the cell. The custody assistant was later joined by additional deputies. Throughout this time, Mr. Garcia's cellmates told the deputies that he was having a heart attack and pleaded with them for help. The custody assistant and deputies just stood outside Mr. Garcia's cell as the minutes ticked by, verbally berating him as they watched him suffer and struggle to breath.

12.     It was not until Mr. Garcia fell over and became unresponsive, approximately half an hour or longer after Mr. Garcia's cellmates first called for medical attention, that deputies finally entered the cell and summoned a nurse.

13.     Mr. Garcia was later declared dead due to a cardiac event.

14.     Mr. Garcia's mother Teresa Garcia is left devasted at the loss of her son.

_____

[4] *Id.*

Mr. Garcia's two children Rodolfo Garcia and Lexy Garcia are left heartbroken without their father.

15.     Teresa, Rodolfo, and Lexy Garcia bring this action in their individual capacities and as Abel Garcia's successors in interest for damages against Defendants for general, compensatory, and statutory damages, costs and attorneys' fees, declaratory and injunctive relief resulting from Defendants' unlawful and egregious conduct, as alleged herein. Additionally, Plaintiff seeks punitive damages against the individual Defendants.

**PARTIES**

16.     Plaintiff Teresa Garcia is the mother and next-of-kin of the decedent Abel Garcia, who died as a result of acts and failures to act of Defendants and/or their agents while in custody of Defendant County of Los Angeles, subjecting Teresa Garcia to injuries and damages as described herein. Teresa Garcia sues Defendants in her individual capacity for the violation of her rights under state and federal law, and as Abel Garcia's successor in interest for the violation of his rights under state and federal law.

17.     Plaintiff Rodolfo Garcia is the son and next-of-kin of the decedent Abel Garcia, who died as a result of acts and failures to act of Defendants and/or their agents while in custody of Defendant County of Los Angeles, subjecting Rudolfo Garcia to injuries and damages as described herein. Rodolfo Garcia sues Defendants in his individual capacity for the violation of his rights under state and federal law, and as Abel Garcia's successor in interest for the violation of his rights under state and federal law.

18.     Plaintiff Lexy Garcia is the daughter and next-of-kin of the decedent Abel Garcia, who died as a result of acts and failures to act of Defendants and/or their agents while in custody of Defendant County of Los Angeles, subjecting Lexy Garcia to injuries and damages as described herein. Lexy Garcia sues Defendants in her individual capacity for the violation of her rights under state and federal law, and as

Abel Garcia's successor in interest for the violation of his rights under state and federal law.

19.     Defendant County of Los Angeles is a duly organized public entity existing under the laws of the State of California. The Los Angeles County Sheriff's Department ("LASD") is the law enforcement agency for Defendant County of Los Angeles. The County of Los Angeles is responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies, including LASD and its agents and employees. At all relevant times, Defendant County of Los Angeles was responsible for ensuring that the actions, omissions, policies, procedures, practices, and customs of the LASD and its agents and employees complied with the laws of the United States and the State of California.

20.     Defendants Does 1-20 are LASD custody assistants and deputies who responded to Abel Garcia's cell on April 26, 2023, when he experienced the medical emergency, and the supervisors responsible for their training and setting LASD policy.

21.     At all relevant times, the County of Los Angeles was the employer of Defendants Does 1-20. Defendants Does 1-20 are custody assistants and deputies for the LASD. At the time of the incident, Defendants Does 1-20 were acting under color of law within the course and scope of their duties as custody assistants and deputies for the LASD. Defendants Does 1-20 were acting with the complete authority and ratification of their principal, Defendant County of Los Angeles.

22.     On information and belief, Defendants Does 1-20 at all relevant times were, and are, residents of the County of Los Angeles, California. In doing the acts and failing to act as hereinafter described, Defendants Does 1-20 were acting on the implied and actual permission and consent of the Defendant County of Los Angeles. The true names and capacities of Defendants Does 1-20 are unknown to Plaintiff, who otherwise sue these Defendants by such fictitious names. Plaintiff will amend this Complaint or seek leave to do so when the true names and capacities of these Defendants have been ascertained. Each of the fictitiously named Defendants is responsible in some manner

for the acts, omissions, injuries, and damages alleged herein.

23.     Plaintiff is informed and believe and thereon allege that at all times relevant herein, Defendants and each of them were the agents, employees, servants, joint venturers, partners, and/or co-conspirators of the other Defendants named in this Complaint and that at all times, each of the Defendants was acting within the course and scope of said relationship with Defendants.

24.     All of the acts and omissions complained of herein by Plaintiff against Defendants were done and performed by said Defendants by and through their authorized agents, servants and/or employees, all of whom at all relevant times herein were acting within the course, purpose, and scope of said agency, service, and/or employment capacity. Moreover, Defendants and their agents ratified all of the acts and omissions complained of herein. Whenever and wherever reference is made in this Complaint for Damages to any act or failure to act by a Defendant or Defendants, such allegations and references shall also be deemed to mean the acts and failures to act of each Defendant acting individually, jointly, and severally.

**JURISDICTION**

25.     This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) because Plaintiffs assert claims arising under the laws of the United States including 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments of the United States Constitution. Plaintiff's state-law claims form part of the same case and controversy and are within the supplemental jurisdiction of the Court pursuant to 28 U.S.C. § 1367.

**VENUE**

26.     Venue is proper in the United States District Court of the Central District of California pursuant to 28 U.S.C. § 1391(b)(1) as the Central District is "a judicial district in which any defendant resides" and "all defendants are residents of the State in which the district is located." Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2), as the Central District is "a judicial district in which a substantial part of the events or

omissions giving rise to the claim occurred[.]" Venue is proper in this Court because all incidents, events, and occurrences giving rise to this action occurred in the County of Los Angeles, California.

## ADMINISTRATIVE PREREQUISITES

27.    Plaintiffs exhausted their administrative remedies by timely filing governmental tort claims with the County of Los Angeles pursuant to California Government Code sections 910 *et seq.* Plaintiff Teresa Garcia filed tort claims in her individual capacity and as successor in interest to Abel Garcia on September 1, 2023. The County rejected Teresa Garcia's tort claims when it failed to respond to the claim by October 16, 2023, the forty-five-day time period set forth in California Government Code Section 911.6.

28.    Plaintiff Rodolfo Garcia filed tort claims in his individual capacity and as successor in interest to Abel Garcia on September 1, 2023. The County rejected Rodolfo Garcia's tort claims on September 27, 2023.

29.    Plaintiff Lexy Garcia filed tort claims in her individual capacity and as successor in interest to Abel Garcia on October 23, 2023. The County rejected Lexy Garcia's tort claims on November 30, 2023.

## FACTUAL ALLEGATIONS

30.    Abel Garcia was the proud father of two children, Rodolfo Garcia and Lexy Garcia. Mr. Garcia enjoyed studying the Bible and drinking coffee. He was close with his mother, Teresa Garcia, and often exchanged letters with her, discussing the Bible and his plans for the future.

31.    Mr. Garcia suffered from heart problems and obesity. In 2023, he took prescription heart and blood pressure medication.

32.    Mr. Garcia had been in the custody of LASD since his arrest on May 28, 2022. On March 20, 2023, Mr. Garcia was sentenced to a sixteen-month term with credit for time served and good time/work time. At all relevant times, Mr. Garcia's heart problems were known to LASD.

33.     On April 17, 2023, while in LASD custody, Mr. Garcia was treated at LAC+USC Medical Center for congestive heart failure exacerbation.

34.     In approximately mid-April 2023, Mr. Garcia was transferred to Men's Central Jail, which is operated by LASD. Mr. Garcia was housed in cell A6 in Module 2900.

35.     While incarcerated at Men's Central Jail, Mr. Garcia did not use or possess any illegal drugs.

36.     On information and belief, on or about April 24, 2023, Mr. Garcia submitted a request for medical treatment.

37.     At approximately 5:00 p.m. on April 26, 2023, Mr. Garcia got into the shower in the dayroom of his cell. Less than one minute later, Mr. Garcia suddenly stumbled out of the shower. Mr. Garcia sat down on a nearby bench. Mr. Garcia appeared to be in medical distress and was exhibiting common signs of a heart attack: he was hyperventilating and having chest palpitations. His lips were purple, his face was pale, and his eyes were dilated.

38.     The four other men who were in Mr. Garcia's cell began to yell "Man down!" in an effort to alert the LASD custody assistants and deputies that someone in their cell needed immediate medical attention. Men in the surrounding cells began to yell "Man down!" as well.

39.     The men continued yelling "Man down!" for a significant period of time before anyone responded to Mr. Garcia's cell. As critical minutes passed, Mr. Garcia continued to exhibit symptoms of medical distress. He did not stand up from the bench or speak.

40.     One custody assistant eventually responded to Mr. Garcia's cell. The custody assistant asked Mr. Garcia, "Why are you naked?" Mr. Garcia did not respond. Mr. Garcia's cellmates asked the custody assistant to call for nurses for Mr. Garcia.

41.     The custody assistant then called for deputy backup over his radio but did not ask for nurses or even state that Mr. Garcia required medical attention. After a

COMPLAINT FOR DAMAGES                          -8-

significant delay, approximately twelve deputies came to Mr. Garcia's cell. The deputies stood outside the cell but did not enter or render aid.

42.     During this time, Mr. Garcia continued exhibiting signs of a likely heart attack. His breathing became shallower, his skin continued to turn paler, and his hands were shaking. One of Mr. Garcia's cellmates put a blanket around Mr. Garcia and held him up so that he would not fall. Mr. Garcia's cellmates begged the deputies to call a nurse for Mr. Garcia.

43.     Even though Mr. Garcia's heart problems were known to LASD and he was exhibiting common signs of a heart attack, the deputies just stood outside of his cell and yelled statements such as, "What drugs is he on?" and "Have him put on his uniform." They did not summon medical attention for Mr. Garcia or attempt to render medical aid. In fact, the deputies ordered the man who was holding Mr. Garcia up to stop helping him.

44.     Mr. Garcia began vomiting blood. The cellmate who had been holding him attempted to catch Mr. Garcia's vomit in a bag. He asked the deputies to open the cell door and walk Mr. Garcia to the nurse's station, which was located across the hall.

45.     Mr. Garcia faintly said, "I am going to die." He begged the deputies, "Please don't let me die."

46.     A deputy pointed his taser at the cellmate and said, "Get away from him, or get tased." The cellmate went to his bunk as instructed.

47.     The deputies continued to stand outside the cell without entering or rendering aid. They continued to yell orders at Mr. Garcia, telling him to stand up and to put his boxers on.

48.     Approximately three or four more deputies arrived outside the cell. These deputies were armed with a gun, pepperball launchers, and tasers. One of the deputies recorded Mr. Garcia and his cellmates with a video camera. A sergeant instructed this deputy regarding what to film. Critical minutes passed, and still the deputies rendered no aid.

49.     Mr. Garcia told the deputies that he could not breathe and that he could not move. In an effort to comply with the deputies' unyielding orders, Mr. Garcia attempted to put on his boxers. To do so, he stood up partially, and then immediately fell forward. Mr. Garcia landed on the floor of the day room, and his throat hit the raised lip of the shower floor. It appeared that Mr. Garcia became unconscious after the fall as he was not moving or speaking at all.

50.     A deputy yelled, "Aw shit, he's not faking it. Quick, call the nurse!" Finally, the deputies entered the cell. A different deputy ordered that Narcan be administered to Mr. Garcia. The deputies rolled the unconscious Mr. Garcia onto his side and administered Narcan.

51.     A nurse arrived. A deputy told the nurse, "We think it's an overdose and we just got here." In fact, the deputies had been standing outside Mr. Garcia's cell for many minutes during which time they watched Mr. Garcia, whom LASD knew to have heart problems, exhibit the common signs of a heart attack. Mr. Garcia's cellmates yelled to the nurse that Mr. Garcia was not on drugs and that he was having a heart attack.

52.     A deputy said in reference to Mr. Garcia's cellmates, "Get those fuckers out of here, there are too many witnesses." The deputies pointed their tasers at Mr. Garcia's cellmates, ordered them to stand up, and took them out of the cell.

53.     Mr. Garcia died that evening.

54.     Hours later, at approximately 10:30 or 11:00 pm, LASD homicide detectives and deputies came to Mr. Garcia's cell. They searched the cell, tearing it apart. One of the LASD officials inside the cell said, "Fuck, there aren't any drugs, call Paz (referring to LASD Deputy Paz) and tell him to strip search them as they probably took it with them." Deputies then strip-searched Mr. Garcia's cellmates but did not find any contraband.

55.     According to the autopsy report completed by the Department of Medical Examiner-Coroner of the County of Los Angeles, Mr. Garcia was pronounced dead at

6:25 p.m.

56.     In the early morning hours of April 27, a deputy told Mr. Garcia's cellmates that he died of an overdose and that a coroner would not arrive until later. Mr. Garcia was only forty-eight years old.

57.     Between approximately 4:00 am and 5:00 am, an LASD coroner dragged Mr. Garcia's naked dead body across the ground on a blanket, out of the cell and into the hallway. Mr. Garcia's body was purple and there were various tubes sticking out of him. The coroner left Mr. Garcia's body on the floor of the hallway for an extended period of time. All of the inmates on the tier were able to see Mr. Garcia. Eventually, the coroner put Mr. Garcia on a gurney and covered him with a tarp.

58.     Mr. Garcia's cellmates were held in various locations throughout the night and were not allowed to return to their cell. A deputy told the cellmates that they could not use the phones until they spoke with detectives about Mr. Garcia. In the early morning hours of April 27, 2023, two LASD Detectives questioned the cellmates about Mr. Garcia. They asked what the cellmates knew about Mr. Garcia, if he used drugs, if he had any enemies, and if he owed anyone money. The cellmates told the detectives that Mr. Garcia had heart problems and that he did not use drugs, have enemies, or owe anyone money.

59.     At approximately 7:00 am on April 27, 2023, Mr. Garcia's cellmates were brought back to their cell. It was clear that the cell had been thoroughly searched. The cellmates' belongings, including Mr. Garcia's belongings, were strewn about the cell, as was various medical equipment. All of the cellmates' uniforms, towels, bedrolls, sheets, and blankets had been removed from the cell. The shower was still running, leaving many of the cellmates' and Mr. Garcia's belongings soaking in water. Mr. Garcia's bloody vomit was still on the floor. The traumatized cellmates were left to clean up the mess on their own.

60.     In the afternoon of April 27, one of Mr. Garcia's cellmate's relatives contacted the LASD Men's Central Jail watch commander to inquire about the search of

the cell and the basic necessities that LASD personnel had removed from the cell. Shortly after, a deputy (badge number 646188) came to Mr. Garcia's cell and yelled something along the lines of, "Who the fuck in here is bitching to mommy and daddy, calling the watch commander?" The cellmates yelled back that Mr. Garcia had just died. The deputy responded along the lines of, "I don't care about that, people die every day, don't come to jail and stop calling the watch commander, I don't care about a bunch of scumbags who are causing us problems. Get the fuck over it. Guys, you're all fucking scumbags, you're in here and I'm out here and honestly you don't give a shit if I die, so why would I give a flying fuck if you die or let alone have your crap taken and damaged. You're only making my job harder by bitching to my boss and getting me in trouble." Deputies eventually brought Mr. Garcia's cellmates uniforms, towels, bedrolls, sheets, and blankets and told them, "Don't say nothing." The cellmates understood this to be a veiled threat that they could not speak about the death of Mr. Garcia or the subsequent search of their cell and removal of their belongings.

61.    Following the death of Mr. Garcia, LASD deputies and custody assistants continued to harass and intimidate Mr. Garcia's cellmates in a clear attempt to bully them into not speaking out about Mr. Garcia's death. For example, in the afternoon of April 27, one of Mr. Garcia's cellmates was talking on the phone about Mr. Garcia's death, and LASD personnel turned off the phone. After Mr. Garcia's death, the p.m. deputies began regularly turning off the phones in the cell for their entire shift. On approximately May 1, 2023, LASD personnel assigned one of Mr. Garcia's cellmates to be transferred to Pitchess Detention Center. Transferring an inmate to Pitchess Detention Center is widely known to be a retaliatory act. On May 9, 2023, all of the inmates on Mr. Garcia's tier were taken in their boxers, shirts, and shower shoes to the 3000 cell block yard where they were strip searched in public view in the rain. While the inmates were being searched outside, LASD personnel searched and ripped apart their cells.

62.    According to the autopsy report completed by the Department of Medical

Examiner-Coroner of the County of Los Angeles, Mr. Garcia died of a cardiac event related to atherosclerotic and hypertensive cardiovascular disease. No illegal drugs were found in Mr. Garcia's system.

63.    LASD has a widespread and ongoing policy, custom, and practice of neglecting and failing to timely summon and/or provide constitutionally required medical care to inmates.

64.    On September 29, 2023, Maxwell Aguierre died while in LASD custody from an apparent suicide after LASD deputies missed up to three mandatory welfare checks while watching internet videos.[5]

65.    On June 13, 2023, Masoud Rahmati died while in LASD custody. Rahmati was severely beaten. LASD deputies did not attempt to render aid to Rahmati for nearly four hours. He was later declared dead.[6]

66.    On September 9, 2022, Amanda Bews died from withdrawal while in LASD custody. Bews' family filed a lawsuit against Defendant County of Los Angeles alleging that LASD did not provide Bews with medical treatment despite its knowledge that Bews required acute care. The case is currently pending. *See Estate of Amanda Bews v. County of Los Angeles, et al.*, No. 2:23-cv-09775-PA-JPR.

67.    On July 6, 2022, Leland William Barnett died while in the custody of LASD. Barnett's family filed a lawsuit against Defendant County of Los Angeles alleging that Barnett complained of head and hip pain when he was arrested by LASD but was not given medical care. The following morning, while still in LASD custody, Barnett passed away. The case is currently pending. *See Kimberly Lamb, et al. v.*

---

[5] *See* Emily Elena Dugdale, *A Man Died by Suicide at Twin Towers While Guards Allegedly Watched Videos,* L.A. PUBLIC PRESS, Oct. 25, 2023, available at https://lapublicpress.org/2023/10/a-man-hanged-himself-at-twin-towers-so-lasd-restricted-video-streaming/.

[6] *See* Keri Blakinger, *He was Beaten to Death in Men's Central Jail. It Took Nearly 4 Hours to Notice,* L.A. TIMES, Oct. 19, 2023, available at https://www.latimes.com/california/story/2023-10-19/los-angeles-mens-central-jail-homicides-masoud-rahmati.

*County of Los Angeles, et al.*, No. 2:2023-cv-03479-JLS-MAA.

68.     On July 19, 2021, Celestina Echesirim died while in custody of LASD. Echesirim's family filed a lawsuit against Defendant County of Los Angeles alleging that LASD personnel observed Echesirim lying on the floor of her cell, unresponsive and not breathing, but did not conduct a safety check on her until at least seventeen minutes later. Echesirim was later declared dead. The case is currently pending. *See Echesirim, et al. v. County of Los Angeles, et al.*. No. 22STCV25988.

69.     On October 27, 2019, Robert Cothran, who suffered from heart conditions, died while in the custody of LASD. Cothran's family filed a lawsuit against Defendant County of Los Angeles alleging that Cothran complained to jail staff that he was experiencing chest pains and shortness of breath, but LASD personnel ignored his pleas to see a doctor and he died due to cardiac issues. The case settled. *See Jackie Cothran v. County of Los Angeles et al.*, No. 2:21-cv-02882 DSF (KSx).

70.     Juan Marcos Gonzalez Amezcua filed a lawsuit against Defendant County of Los Angeles alleging that while in LASD custody in 2019, LASD personnel refused to provide him medical care despite a medical order issued by the Los Angeles Superior Court. Mr. Gonzalez Amezcua alleged that as a result, he required surgery. The case settled. *See Juan Marcos Gonzalez Amezcua v. County of Los Angeles, et al.*, No. 20STCV18161.

71.     On August 15, 2018, Tony Joseph Evans died while in LASD custody. Evans' family filed a lawsuit against Defendant County of Los Angeles alleging that LASD deputies witnessed an inmate brutally beating Evans but did not meaningfully intervene or summon medical care for several minutes. Evans later died from his injuries. The case settled. *See Joseph Evans, et al. v. County of Los Angeles, et al.*, No. 2:19-cv-00793-MWF-JEM.

72.     On July 17, 2018, Adrian Vilches died while in LASD custody. Vilches' family filed a lawsuit against Defendant County of Los Angeles alleging that while in custody, LASD was aware that Vilches had a history of heart disease and Vilches

exhibited obvious signs of medical distress but LASD did not seek medical attention for Vilches. The case settled. *See A.S.M.V., et al. v. County of Los Angeles, et al.*, No. 2:19-cv-06158-SB-PLA.

73.     On March 9, 2018, Quinten Thomas died from a seizure while in LASD custody. Thomas's family filed a lawsuit against Defendant County of Los Angeles alleging that LASD did not provide Thomas the appropriate level of care for his medical condition, which included a history of seizures. The case settled. *See Saharra M. White, et al. v. County of Los Angeles, et al.*, No. 2:19-cv-04669-DSF-RAO.

74.     On November 2, 2017, Angela Lynn Connor died while in LASD custody. Connor's family filed a lawsuit against Defendant County of Los Angeles alleging that Connor complained of not feeling well yet LASD personnel denied her medical care, causing her death. The case is currently pending. *See Nathaniel Vaughn Riley v. County of Los Angeles, et al.*, No. 18STCV06789.

75.     On September 25, 2017, Octavius Caldwell died from complications related to diabetes while in LASD custody. Caldwell's family filed a lawsuit against Defendant County of Los Angeles alleging that Caldwell's death was caused by a lack of medical treatment, proper care, and monitoring. The case settled. *See Samuel Caldwell et al. v. County of Los Angeles*, No. 2:18-CV-06906-PSG-MRW.

76.     On May 15, 2012, Juan Isaac Garza was found unresponsive in his cell in an LASD jail. Garza filed a lawsuit against Defendant County of Los Angeles alleging that an inmate informed jail staff that Garza fell and hit his head repeatedly yet did not provide medical care to Garza. Garza alleges that as a result, he was left permanently disfigured and disabled. The case settled. *See Juan Isaac Garza v. County of Los Angeles et al.*, No. 2:13-cv-02938-GAF-VBK.

77.     Furthermore, Defendant County of Los Angeles' Sybil Brand Commission, which is tasked with routinely inspecting county jails, recently reported that it "regularly hears from adults incarcerated in the jails who either make direct requests for health care, allege excessive or indeterminate wait times, or feel their requests to see a

clinician are [being] ignored or disregarded."[7]

78.     A recent study of in-custody deaths in the Los Angeles County jails found "issues of . . . healthcare access" and confirmed that "deputies and carceral staff appear to have neglected the medical or psychiatric needs of incarcerated people."[8]

79.     This policy and custom of deliberate indifference to the medical needs of inmates has been allowed to persist in the Los Angeles County jails due in large part to the fact that "a self-aware culture of impunity exists amongst some deputies working in custody."[9]

**CLAIMS FOR RELIEF**

**<u>First Claim for Relief</u>**

**42 U.S.C. § 1983 (Deliberate Indifference to Serious Medical Need in Violation of Eighth Amendment to the United States Constitution)**

**(All Plaintiffs, as Successors in Interest of Decedent Abel Garcia, Against All Defendants)**

80.     Plaintiffs re-allege and incorporate by reference all previous paragraphs as though fully set forth herein.

81.     On or about April 26, 2023, after causes of action arose in his favor, Decedent Abel Garcia would have been a Plaintiff in this action had he survived.

82.     Defendants, acting under color of state law, deprived Mr. Garcia of rights, privileges, and immunities secured by the Constitution and the laws of the United States, including those secured by the Eighth Amendment to the Constitution, incorporated and made applicable to the states by the Fourteenth Amendment.

83.     Mr. Garcia faced a serious medical need when he experienced a cardiac event on April 26, 2023.

---

[7] Los Angeles County Sybil Brand Commission for Institutional Inspections, REPORT & RECOMMENDATIONS ON THE LOS ANGELES COUNTY JAILS HUMANITARIAN CRISIS 14 (July 2023), available at https://file.lacounty.gov/SDSInter/bos/supdocs/185367.pdf.
[8] Shapiro, *supra* note 2.
[9] Sybil Brand Commission, *supra* mote 9 at 17.

84.    Defendants knew or should have known that Mr. Garcia faced this serious medical need which required immediate medical treatment for numerous reasons. Mr. Garcia suffered from heart problems and high blood pressure, was obese, took prescription heart and blood pressure medication, and was treated for congestive heart failure exacerbation nine days prior. These facts were known to Defendants.  During the cardiac event, Mr. Garcia displayed common signs of a heart attack including hyperventilation, chest palpitations, and vomiting blood. His skin was pale and his eyes were dilated. Mr. Garcia eventually fell over and it appeared that he lost consciousness. Defendants observed these symptoms yet refused to timely summon and/or render aid. Moreover, Mr. Garcia's cellmates repeatedly told Defendants that Mr. Garcia was having a heart attack and did not use drugs.

85.    Defendants decided not to provide or summon any medical evaluation or treatment to Mr. Garcia while they watched him experience a cardiac event, despite his known history of heart problems, obvious symptoms of medical crisis, and overt medical emergency. On information and belief, had Defendants timely summoned and/or rendered medical aid, Mr. Garcia would have survived.

86.    Each of the Doe Defendants were both personally involved and an integral participant in the violation of Mr. Garcia's constitutional rights because each Doe Defendant was aware of the unlawful actions of the other Doe Defendants, did not object to these violations of Mr. Garcia's rights, and participated in the violations by refusing to provide or summon any medical assessment or treatment for Mr. Garcia.

87.    The foregoing wrongful acts and failures to act of Defendants killed Mr. Garcia. As a proximate result of the foregoing wrongful acts of Defendants, and each of them, Mr. Garcia suffered great pain, suffering, mental and emotional anguish, the loss of the enjoyment of life, and death.

88.    Defendants' acts and/or omissions as alleged herein, including but not limited to their failure to provide Mr. Garcia with any medical assessment or treatment while they watched him experience a cardiac event, along with the acts and/or

COMPLAINT FOR DAMAGES               -17-

omissions of the Defendants in failing to train, supervise and/or promulgate appropriate policies and procedures in order to provide prompt medical treatment, constituted deliberate indifference to Mr. Garcia's serious medical needs, health, and safety.

89.     The aforementioned acts of the Doe Defendants were conducted with conscious disregard for the safety of Mr. Garcia and others, and were therefore malicious, wanton, and oppressive. As a result, those Defendants' actions justify an award of exemplary and punitive damages against the individual Defendants (but not the entity Defendant) to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**<u>Second Claim for Relief</u>**

**42 U.S.C. § 1983 (Failure to Protect from Harm in Violation of the Eighth Amendment to the United States Constitution)**

**(All Plaintiffs, as Successors in Interest of Decedent Abel Garcia, Against all Defendants)**

90.     Plaintiffs re-allege and incorporate by reference the allegations contained in this complaint, as though fully set forth herein.

91.     On or about April 26, 2023, after causes of action arose in his favor, Decedent Abel Garcia would have been a Plaintiff in this action had he survived.

92.     Each Defendant could have taken action to prevent unnecessary harm to Mr. Garcia but refused or failed to do so. Defendants decided to not provide or summon any medical evaluation or treatment to Mr. Garcia while they watched him experience a cardiac event, despite his known history of heart problems, obvious symptoms of medical crisis, and overt medical emergency. On information and belief, had Defendants timely rendered medical aid, Mr. Garcia would have survived.

93.     Defendants knew or should have known that Mr. Garcia faced this serious medical need which required immediate medical treatment for numerous reasons. Mr. Garcia suffered from heart problems and high blood pressure, was obese, took prescription heart and blood pressure medication, and was treated for congestive heart

failure exacerbation nine days prior. These facts were known to Defendants.  During the cardiac event, Mr. Garcia displayed common signs of a heart attack including hyperventilation, chest palpitations, and vomiting blood. His skin was pale and his eyes were dilated. Mr. Garcia eventually fell over and it appeared that he lost consciousness. Defendants observed these symptoms yet refused to timely summon and/or render aid. Moreover, Mr. Garcia's cellmates repeatedly told Defendants that Mr. Garcia was having a heart attack and did not use drugs.

94.    Defendants' decision to refuse to provide or summon medical attention or treatment to Mr. Garcia while they watched him experience a cardiac event, with his known history of heart problems, put Mr. Garcia as serious risk of serious injury or death.

95.    Defendants failed to take any reasonable available measures to abate the risk of harm to Mr. Garcia such as immediately summoning medical personnel, examining Mr. Garcia, or rendering medical aid to Mr. Garcia. Any reasonable officer in Defendants' position would have appreciated that Mr. Garcia was at serious risk of death or injury and that reasonable measures were available to abate this. The consequences of Defendants' conduct were undeniably obvious.

96.    Defendants' acts and/or omissions as alleged herein, including but not limited to their failure to take any reasonable available measures to abate the risk of harm to Mr. Garcia such as immediately summoning medical personnel, examining Mr. Garcia, or rendering medical aid to Mr. Garcia despite the fact that any reasonable officer in Defendants' position would have appreciated that Mr. Garcia was at serious risk of death or injury and that reasonable measures were available to abate this, constituted deliberate indifference to Mr. Garcia's serious medical needs, health, and safety.

97.    Each of the Doe Defendants were both personally involved and an integral participant in the violation of Mr. Garcia's constitutional rights because each Doe Defendant was aware of the unlawful actions of the other Doe Defendants, did not

object to these violations of Mr. Garcia's rights, and participated in the violations by refusing to provide or summon any medical assessment or treatment for Mr. Garcia.

98.     The foregoing wrongful acts and failures to act of Defendants killed Mr. Garcia. As a proximate result of the foregoing wrongful acts of Defendants, and each of them, Mr. Garcia suffered great pain, suffering, mental and emotional anguish, the loss of the enjoyment of life, and death.

99.     The aforementioned acts of the Doe Defendants were conducted with conscious disregard for the safety of Mr. Garcia and others, and were therefore malicious, wanton, and oppressive. As a result, those Defendants' actions justify an award of exemplary and punitive damages against the individual Defendants (but not the entity Defendant) to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## **Third Claim for Relief**

**42 U.S.C. § 1983 (Deprivation of Substantive Due Process Rights in Violation of Fourteenth Amendment to United States Constitution – Loss of Parent/Child Relationship)**

**(All Plaintiffs, in Their Individual Capacities, Against all Defendants)**

100.   Plaintiffs re-allege and incorporate by reference the allegations contained in this complaint, as though fully set forth herein.

101.   Defendants, acting under color of state law, deprived Plaintiffs of their right to a familial relationship with Mr. Garcia without due process of law in violation of the Fourteenth Amendment by their refusal to timely provide and/or summon any medical evaluation or treatment to Mr. Garcia while they watched him experience a cardiac event, despite his known history of heart problems, obvious symptoms of medical crisis, and overt medical emergency, which shocks the conscience, evidences deliberate indifference on the part of the Doe Defendants, demonstrates an intent and purpose to harm, and caused injuries which resulted in Mr. Garcia's death.

102.   The foregoing wrongful acts and failures to act of Defendants killed Mr.

Garcia. As a proximate result of the foregoing wrongful acts of Defendants, and each of them, Mr. Garcia suffered great pain, suffering, and death, and Plaintiffs have suffered and continue to suffer humiliation, hardship, anxiety, indignity, and severe mental and emotional anguish.

103.   By engaging in the foregoing wrongful acts and failures to act, Defendants acted with conscious disregard of Mr. Garcia's rights. Defendants knew or should have known that Mr. Garcia faced this serious medical need which required immediate medical treatment for numerous reasons. Mr. Garcia suffered from heart problems and high blood pressure, was obese, took prescription heart and blood pressure medication, and was treated for congestive heart failure exacerbation nine days prior. These facts were known to Defendants.  During the cardiac event, Mr. Garcia displayed common signs of a heart attack including hyperventilation, chest palpitations, and vomiting blood. His skin was pale and his eyes were dilated. Mr. Garcia eventually fell over and it appeared that he lost consciousness. Defendants observed these symptoms yet refused to timely summon and/or render aid. Moreover, Mr. Garcia's cellmates repeatedly told Defendants that Mr. Garcia was having a heart attack and did not use drugs. Nonetheless, Defendants refused to provide Mr. Garcia with any medical assessment or treatment while they watched him experience a cardiac event. Furthermore, the acts and/or omissions of the Defendants in failing to train, supervise and/or promulgate appropriate policies and procedures in order to provide prompt medical treatment, constituted deliberate indifference to Mr. Garcia's serious medical needs, health, and safety.

104.   The aforementioned acts of the Doe Defendants were conducted with conscious disregard for the safety of Mr. Garcia and others, and were therefore malicious, wanton, and oppressive. As a result, those Defendants' actions justify an award of exemplary and punitive damages against the individual Defendants (but not the entity Defendant) to punish the wrongful conduct alleged herein and to deter such conduct in the future.

1
2
3
4

**Fourth Claim for Relief**

**42 U.S.C. § 1983 (Monell Liability)**

**(All Plaintiffs, in Their Individual Capacities and as Successors in Interest of Decedent Abel Garcia, Against Defendant County of Los Angeles)**

5    105.   Plaintiffs re-allege and incorporate by reference the allegations contained
6    in this complaint, as though fully set forth herein.

7    106.   On or about April 26, 2023, after causes of action arose in his favor,
8    Decedent Abel Garcia would have been a Plaintiff in this action had he survived.

9    107.   Defendants, acting under color of state law, deprived Mr. Garcia of rights,
10   privileges, and immunities secured by the Constitution and the laws of the United
11   States, including those secured by the Eighth Amendment to the Constitution,
12   incorporated and made applicable to the states by the Fourteenth Amendment by their
13   failure to provide Mr. Garcia with and/or summon any medical assessment or treatment
14   while they watched him experience a cardiac event, despite his known history of heart
15   problems, obvious symptoms of medical crisis, and overt medical, along with the acts
16   and/or omissions of the Defendants in failing to train, supervise and/or promulgate
17   appropriate policies and procedures in order to provide prompt medical treatment and
18   their failure to take any reasonable available measures to abate the risk of harm to Mr.
19   Garcia such as immediately summoning medical personnel, examining Mr. Garcia, or
20   rendering medical aid to Mr. Garcia despite the fact that any reasonable officer in
21   Defendants' position would have appreciated that Mr. Garcia was at serious risk of
22   death or injury and that reasonable measures were available to abate this, evidencing
23   deliberate indifference to Mr. Garcia's serious medical needs, health, and safety, which
24   shocks the conscience, evidences deliberate indifference on the part of the Doe
25   Defendants, demonstrates an intent and purpose to harm, and caused injuries which
26   resulted in Mr. Garcia's death.

27   108.   In addition, Defendants, acting under color of state law, deprived Plaintiffs
28   of their right to a familial relationship with Mr. Garcia without due process of law in

violation of the Fourteenth Amendment by these same acts and omissions, which shocks the conscience, evidences deliberate indifference on the part of the Doe Defendants, demonstrates an intent and purpose to harm, and caused injuries which resulted in Mr. Garcia's death.

109.   The aforementioned acts and/or omissions of Defendants in being deliberatively indifferent to Mr. Garcia's serious medical needs, health and safety, violating Mr. Garcia's and Plaintiffs' civil rights, and engaging in acts and omissions that shock the conscience, evidence deliberate indifference,  and demonstrate an intent and purpose to harm were the direct and proximate result of customs, practices and policies of Defendant County of Los Angeles, by and through their agencies, employees and/or agents, as alleged herein.

110.   During Mr. Garcia's incarceration, Defendant County of Los Angeles had inadequate policies, procedures, and practices for providing prompt medical attention and treatment to inmates in need of medical treatment, including emergency medical treatment.

These inadequate policies, procedures, and practices include, but are not limited to:

a.   Defendant County of Los Angeles delayed and/or denied access to medical treatment, including to inmates in obvious medical distress or emergency.

b.   Defendant County of Los Angeles ignored medical needs and concerns of inmates.

c.   Defendant County of Los Angeles observed or was on notice of risks of harm to inmates and refused to take any action to abate or mitigate the risk of harm.

d.   Defendant County of Los Angeles failed to ensure staff provided prompt medical attention and treatment to inmates in need of medical treatment.

e.   Defendant County of Los Angeles assumed that and treated any inmate exhibiting symptoms of medical distress is if they were under the influence

of illegal drugs and declined to examine or consider any other explanation for the inmate's medical distress, resulting in harmful delays in care.

f.  Defendant County of Los Angeles failed to properly train and supervise staff regarding policies, procedures, and practices necessary for the provision of medical treatment.

g.  Defendant County of Los Angeles willfully suppressed information that would reveal their unconstitutional practices, including but not limited to intimidating witnesses to such their unlawful acts.

Defendant County of Los Angeles' failure to correct their policies, procedures, and practices of delaying and/or denying medical treatment to inmates evidences deliberate indifference in the provision of medical treatment, shocks the conscience, and demonstrates an intent and purpose to harm.

111.  The allegations in Paragraph 110 hereinabove are supported by the facts of the following incidents, *inter alia*:

a.  In 2023, forty-five people died in the custody of LASD. In 2022, fifty-three people died in LASD custody. In 2021, 2020, and 2019, fifty-five, forty-one, and thirty-seven people died in LASD custody respectively.  On information and belief, many of these deaths resulted from delays and/or denials of care, including emergency care, in violation of the Eighth and/or Fourteenth Amendments to the United States Constitution.  Such deaths include, but are not limited to, the following:

b.  On September 29, 2023, Maxwell Aguierre died while in LASD custody from an apparent suicide after LASD deputies missed up to three mandatory welfare checks while watching internet videos.[10]

c.  On June 13, 2023, Masoud Rahmati died while in LASD custody. Rahmati was severely beaten. LASD deputies did not attempt to render aid to

---

[10] *See* Dugdale, *supra* note 7.

Rahmati for nearly four hours. He was later declared dead.[11]

d.      On September 9, 2022, Amanda Bews died from withdrawal while in LASD custody. Bews' family filed a lawsuit against Defendant County of Los Angeles alleging that LASD did not provide Bews with medical treatment despite its knowledge that Bews required acute care. The case is currently pending. *See Estate of Amanda Bews v. County of Los Angeles, et al.*, No. 2:23-cv-09775-PA-JPR.

e.      On July 6, 2022, Leland William Barnett died while in the custody of LASD. Barnett's family filed a lawsuit against Defendant County of Los Angeles alleging that Barnett complained of head and hip pain when he was arrested by LASD but was not given medical care. The following morning, while still in LASD custody, Barnett passed away. The case is currently pending. *See Kimberly Lamb, et al. v. County of Los Angeles, et al.*, No. 2:2023-cv-03479-JLS-MAA.

f.      On July 19, 2021, Celestina Echesirim died while in custody of LASD. Echesirim's family filed a lawsuit against Defendant County of Los Angeles alleging that LASD personnel observed Echesirim lying on the floor of her cell, unresponsive and not breathing, but did not conduct a safety check on her until at least seventeen minutes later. Echesirim was later declared dead. The case is currently pending. *See Echesirim, et al. v. County of Los Angeles, et al.*. No. 22STCV25988.

g.      On October 27, 2019, Robert Cothran, who suffered from heart conditions, died while in the custody of LASD. Cothran's family filed a lawsuit against Defendant County of Los Angeles alleging that Cothran complained to jail staff that he was experiencing chest pains and shortness of breath, but LASD personnel ignored his pleas to see a doctor and he died due to cardiac issues. The case settled. *See Jackie Cothran v. County*

---

[11] *See* Blakinger, *supra* note 8.

COMPLAINT FOR DAMAGES                    -25-

1    *of Los Angeles et al.*, No. 2:21-cv-02882 DSF (KSx).

2    h.    Juan Marcos Gonzalez Amezcua filed a lawsuit against Defendant County

3          of Los Angeles alleging that while in LASD custody in 2019, LASD

4          personnel refused to provide him medical care despite a medical order

5          issued by the Los Angeles Superior Court. Mr. Gonzalez Amezcua alleged

6          that as a result, he required surgery. The case settled. *See Juan Marcos*

7          *Gonzalez Amezcua v. County of Los Angeles, et al.*, No. 20STCV18161.

8    i.    On August 15, 2018, Tony Joseph Evans died while in LASD custody.

9          Evans' family filed a lawsuit against Defendant County of Los Angeles

10         alleging that LASD deputies witnessed an inmate brutally beating Evans

11         but did not meaningfully intervene or summon medical care for several

12         minutes. Evans later died from his injuries. The case settled. *See Joseph*

13         *Evans, et al. v. County of Los Angeles, et al.*, No. 2:19-cv-00793-MWF-

14         JEM.

15   j.    On July 17, 2018, Adrian Vilches died while in LASD custody. Vilches'

16         family filed a lawsuit against Defendant County of Los Angeles alleging

17         that while in custody, LASD was aware that Vilches had a history of heart

18         disease and Vilches exhibited obvious signs of medical distress but LASD

19         did not seek medical attention for Vilches. The case settled. *See A.S.M.V.,*

20         *et al. v. County of Los Angeles, et al.*, No. 2:19-cv-06158-SB-PLA.

21   k.    On March 9, 2018, Quinten Thomas died from a seizure while in LASD

22         custody. Thomas's family filed a lawsuit against Defendant County of Los

23         Angeles alleging that LASD did not provide Thomas the appropriate level

24         of care for his medical condition, which included a history of seizures. The

25         case settled. *See Saharra M. White, et al. v. County of Los Angeles, et al.*,

26         No. 2:19-cv-04669-DSF-RAO.

27   l.    On November 2, 2017, Angela Lynn Connor died while in LASD custody.

28         Connor's family filed a lawsuit against Defendant County of Los Angeles

COMPLAINT FOR DAMAGES              -26-

alleging that Connor complained of not feeling well yet LASD personnel denied her medical care, causing her death. The case is currently pending. *See Nathaniel Vaughn Riley v. County of Los Angeles, et al.*, No. 18STCV06789.

m.    On September 25, 2017, Octavius Caldwell died from complications related to diabetes while in LASD custody. Caldwell's family filed a lawsuit against Defendant County of Los Angeles alleging that Caldwell's death was caused by a lack of medical treatment, proper care, and monitoring. The case settled. *See Samuel Caldwell et al. v. County of Los Angeles*, No. 2:18-CV-06906-PSG-MRW.

n.    On May 15, 2012, Juan Isaac Garza was found unresponsive in his cell in an LASD jail. Garza filed a lawsuit against Defendant County of Los Angeles alleging that an inmate informed jail staff that Garza fell and hit his head repeatedly yet did not provide medical care to Garza. Garza alleges that as a result, he was left permanently disfigured and disabled. The case settled. *See Juan Isaac Garza v. County of Los Angeles et al.*, No. 2:13-cv-02938-GAF-VBK.

o.    Defendant County of Los Angeles' Sybil Brand Commission, which is tasked with routinely inspecting county jails recently reported that it "regularly hears from adults incarcerated in the jails who either make direct requests for health care, allege excessive or indeterminate wait times, or feel their requests to see a clinician are been ignored or disregarded."[12]

p.    A recent study of in custody deaths in the Los Angeles County jails found "issues of . . . healthcare access" and confirmed that "deputies and carceral staff appear to have neglected the medical or psychiatric needs of

---

[12] Sybil Brand Commission, *supra* mote 9 at 17.

COMPLAINT FOR DAMAGES                              -27-

incarcerated people."[13]

112.   Defendants tacitly encouraged, ratified and/or approved of the acts and/or omissions alleged herein, including by way of:

a.   Defendants attempted to inaccurately portray the cause of Mr. Garcia's death as an overdose by telling the nurse, "We think it's an overdose and we just got here."

b.   Defendants removed Mr. Garcia's cellmates from the cell because "there [were] too many witnesses."

c.   Defendants attempted to inaccurately portray the cause of Mr. Garcia's death as an overdose by searching the cell for drugs and then stating, "Fuck, there aren't any drugs, call Paz (referring to LASD Deputy Paz) and tell him to strip search them as they probably took it with them."

d.   Defendants attempted to inaccurately portray the cause of Mr. Garcia's death as an overdose by telling Mr. Garcia's cellmates that he died of a drug overdose.

e.   Defendants dragged Mr. Garcia's naked dead body into the hallway and left him on the floor of the hallway for an extended period of time for all of the inmates on the tier to see.

f.   Defendants attempted to find a self-serving excuse for Mr. Garcia's death by asking Mr. Garcia's cellmates if he used drugs, if he had enemies, and if he owed anyone money.

g.   Defendants thoroughly searched Mr. Garcia's cell after his death. The cellmates' belongings, including Mr. Garcia's belongings, were strewn about the cell, as was various medical equipment. All of the cellmates' uniforms, towels, bedrolls, sheets, and blankets had been removed from the cell. The shower was still running, leaving many of the cellmates' and Mr. Garcia's belongings soaking in water. Mr. Garcia's bloody vomit was still

---

[13] Shapiro, *supra* note 2.

on the floor. The traumatized cellmates were left to clean up the mess on their own.

h.   An LASD deputy told Mr. Garcia's cellmates: "I don't care about that, people die every day, don't come to jail and stop calling the watch commander, I don't care about a bunch of scumbags who are causing us problems. Get the fuck over it. Guys, you're all fucking scumbags, you're in here and I'm out here and honestly you don't give a shit if I die, so why would I give a flying fuck if you die or let alone have your crap taken and damaged. You're only making my job harder by bitching to my boss and getting me in trouble."

i.   Deputies eventually brought Mr. Garcia's cellmates uniforms, towels, bedrolls, sheets, and blankets and told them, "Don't say nothing."

j.   Following the death of Mr. Garcia, LASD deputies and custody assistants continued to harass and intimidate Mr. Garcia's cellmates in a clear attempt to bully them into not speaking out about Mr. Garcia's death. For example, in the afternoon of April 27, one of Mr. Garcia's cellmates was talking on the phone about Mr. Garcia's death, and LASD personnel turned off the phone. After Mr. Garcia's death, the p.m. deputies began regularly turning off the phones in the cell for their entire shift. On approximately May 1, 2023, LASD personnel assigned one of Mr. Garcia's cellmates to be transferred to Pitchess Detention Center. Transferring an inmate to Pitchess Detention Center is widely known to be a retaliatory act. On May 9, 2023, all of the inmates on Mr. Garcia's tier were taken in their boxers, shirts, and shower shoes to the 3000 cell block yard where they were strip searched in public view in the rain. While the inmates were being searched outside, LASD personnel searched and ripped apart their cells.

113.   The customs, policies and/or practices of Defendant County of Los Angeles were a direct and proximate cause of Plaintiffs' injuries and the death of the

Mr. Garcia in that Defendants failed to adequately train and supervise its employees and/or agents to prevent the occurrence of the constitutional violations suffered by Plaintiffs and Mr. Garcia, and by other inmates in the Los Angeles County Jails. Defendants also failed to promulgate appropriate policies or procedures or take other measures to prevent the constitutional violations suffered by Plaintiffs and Mr. Garcia, and by other inmates in the Los Angeles County Jails.

114.   Defendants demonstrated deliberate indifference to their constitutional obligation to provide constitutionally adequate medical care to inmates in their jails in that they knew that such conduct was unjustified and would result in violations of constitutional rights.

115.   Los Angeles County Sheriff Robert Luna, a final policymaker for the Defendant County of Los Angeles, ratified the actions and omissions of the Doe Defendants in that he had knowledge of and made a deliberate choice to approve their unlawful acts and omissions.

<u>**Fifth Claim for Relief**</u>

**Cal. Code Civ. Proc. § 377.60 (Wrongful Death)**

**(Plaintiffs Rodolfo Garcia and Lexy Garcia, in Their Individual Capacities, Against All Defendants)**

116.   Plaintiffs re-allege and incorporate by reference all previous paragraphs as though fully set forth herein.

117.   Abel Garcia had no predeceased spouse or domestic partner and has no surviving spouse, domestic partner. Accordingly, Plaintiffs Rodolfo Garcia and Lexy Garcia, as Mr. Garcia's issue, are entitled to his property by intestate succession pursuant to Probate Code § 6402, and are thus the proper plaintiffs for wrongful death claims under Civil Code § 377.60(a).

118.   Mr. Garcia faced a serious medical need when he experienced a cardiac event on April 26, 2023. Defendants knew or should have known that Mr. Garcia faced this serious medical need which required immediate medical treatment for numerous

reasons. Mr. Garcia suffered from heart problems and high blood pressure, was obese, took prescription heart and blood pressure medication, and was treated for congestive heart failure exacerbation nine days prior. These facts were known to Defendants. During the cardiac event, Mr. Garcia displayed common signs of a heart attack including hyperventilation, chest palpitations, and vomiting blood. His skin was pale and his eyes were dilated. Mr. Garcia eventually fell over and it appeared that he lost consciousness. Defendants observed these symptoms yet refused to timely summon and/or render aid. Moreover, Mr. Garcia's cellmates repeatedly told Defendants that Mr. Garcia was having a heart attack and did not use drugs.

119.   Defendants failed to provide or summon any medical evaluation or treatment to Mr. Garcia while they watched him experience a cardiac event, despite his known history of heart problems, obvious symptoms of medical crisis, and overt medical emergency.

120.   Each of the Doe Defendants were both personally involved and aided and abetted in the violation of Mr. Garcia's rights. Each Doe Defendant was aware of the unlawful actions of the other Doe Defendants, did not object to these violations of Mr. Garcia's rights, participated in the violations, and gave substantial assistance and/or encouragement to the other Doe Defendants by refusing to provide or summon any medical assessment or treatment for Mr. Garcia.

121.   Mr. Garcia's death was a direct and proximate result of the wrongful and/or negligent acts and/or omissions of Defendants. Defendants' acts and/or omissions thus were also a direct and proximate cause of Plaintiffs' injuries and damages, as alleged herein.

122.   As a direct and proximate result of Defendants' wrongful and/or negligent acts and/or omissions, Plaintiffs incurred expenses for funeral and burial expenses in an amount to be proved.

123.   As a direct and proximate result of Defendants' wrongful and/or negligent acts and/or omissions, Plaintiffs suffered the loss of Mr. Garcia's services, society, care,

comfort, support, protection, gifts and benefits, as well as the loss of the present value of his future services to them for the remainder of their lives.

124.   Plaintiffs are further entitled to recover prejudgment interest.

125.   Defendant County of Los Angeles is vicariously liable for its employees' wrongful and/or negligent acts and/or omissions.

126.   The aforementioned acts of the Doe Defendants were conducted with conscious disregard for the safety of Mr. Garcia and others, and were therefore malicious, wanton, and oppressive. As a result, those Defendants' actions justify an award of exemplary and punitive damages against the individual Defendants (but not the entity Defendant) to punish the wrongful conduct alleged herein and to deter such conduct in the future.

### Sixth Claim for Relief

### Cal. Govt Code § 845.6 (Failure to Summon Medical Care)

### (All Plaintiffs, as Successors in Interest of Decedent Abel Garcia, Against All Defendants)

127.   Plaintiffs re-allege and incorporate by reference all previous paragraphs as though fully set forth herein.

128.   On or about April 26, 2023, after causes of action arose in his favor, Decedent Abel Garcia would have been a Plaintiff in this action had he survived.

129.   Defendants owed Mr. Garcia a duty of care to provide him immediate medical care.

130.   The conduct of Defendants alleged herein, including but not limited to the facts that Defendants knew or had reason to know that Mr. Garcia was in need of immediate medical care on April 26, 2023, and that Defendants failed to take reasonable and timely action to summon care, resulting in Mr. Garcia's suffering and death as alleged herein, violated California state law, including Cal. Govt. Code § 845.6.

131.   The failure of Defendants to summon medical care was an omission within

the course and scope of their employment. As a direct and proximate result of Defendants' breach, Mr. Garcia suffered injuries and damages causing great pain and leading to his death, as alleged herein.

132.   Each of the Doe Defendants were both personally involved and aided and abetted in the violation of Mr. Garcia's rights. Each Doe Defendant was aware of the unlawful actions of the other Doe Defendants, did not object to these violations of Mr. Garcia's rights, participated in the violations, and gave substantial assistance and/or encouragement to the other Doe Defendants by refusing to provide or summon any medical assessment or treatment for Mr. Garcia.

133.   The failure of Defendants to summon medical care caused the wrongful death of Plaintiffs' son and father, and entitles them to wrongful-death damages as alleged below.

134.   Defendant County of Los Angeles is vicariously liable for the actions of the Doe Defendants.

135.   The aforementioned acts of the Doe Defendants were conducted with conscious disregard for the safety of Mr. Garcia and others, and were therefore malicious, wanton, and oppressive. As a result, those Defendants' actions justify an award of exemplary and punitive damages against the individual Defendants (but not the entity Defendant) to punish the wrongful conduct alleged herein and to deter such conduct in the future.

### Seventh Claim for Relief

### Cal. Civ. Code § 52.1 (Bane Act)

### (All Plaintiffs, as Successors in Interest of Decedent Abel Garcia, Against All Defendants)

136.   Plaintiffs re-allege and incorporate by reference the allegations contained in this complaint, as though fully set forth herein.

137.   On or about April 26, 2023, after causes of action arose in his favor, Decedent Abel Garcia would have been a Plaintiff in this action had he survived.

COMPLAINT FOR DAMAGES                         -33-

138.   The United States Constitution, Amendment VIII, guarantees the rights of convicted prisoners to be free from cruel and unusual punishment, including the right to medical care and the right to be protected from harm. Defendants, by engaging in the wrongful acts and failures to act alleged in this action, denied this right to Mr. Garcia by threats, intimidation, or coercion, either intentionally or through their deliberate indifference. Defendants' unlawful actions were a substantial factor causing Mr. Garcia's death and also severe injuries and suffering prior to his death. For this reason, Plaintiffs, as successors in interest to Mr. Garcia, may state a claim for damages pursuant to Civil Code section 52.1.

139.   Each of the Doe Defendants were both personally involved and aided and abetted in the violation of Mr. Garcia's rights. Each Doe Defendant was aware of the unlawful actions of the other Doe Defendants, did not object to these violations of Mr. Garcia's rights, participated in the violations, and gave substantial assistance and/or encouragement to the other Doe Defendants by refusing to provide or summon any medical assessment or treatment for Mr. Garcia.

140.    Defendant County of Los Angeles is vicariously liable for the Doe Defendants' misconduct.

141.   As the direct and legal result of Defendants' conduct, Plaintiffs suffered and will continue to suffer damages, including but not limited to those set forth above. Plaintiffs are entitled to statutory damages under Civil Code section 52, including damages up to three times Plaintiff's actual damages but no less than $4,000 for every offense of California Civil Code § 51 *et seq.*, as well as compensatory and punitive damages and attorneys' fees.

142.   The aforementioned acts of the Doe Defendants were conducted with conscious disregard for the safety of Mr. Garcia and others, and were therefore malicious, wanton, and oppressive. As a result, those Defendants' actions justify an award of exemplary and punitive damages against the individual Defendants (but not the entity Defendant) to punish the wrongful conduct alleged herein and to deter such

conduct in the future.

## Eighth Claim for Relief

### Negligence

**(All Plaintiffs, as Successors in Interest of Decedent Abel Garcia, Against All Defendants)**

143.    Plaintiffs re-allege and incorporate by reference all previous paragraphs as though fully set forth herein.

144.    On or about April 26, 2023, after causes of action arose in his favor, Decedent Abel Garcia would have been a Plaintiff in this action had he survived.

145.    Defendants' actions and omissions resulting in Mr. Garcia's death were the result of their negligent failure to abide by the standard of care imposed upon law enforcement departments and deputies in jail settings, including, but not limited to, failing to timely summon necessary medical treatment despite Mr. Garcia's obvious and immediate need. Defendants instead chose to refuse to timely summon any medical evaluation or treatment of Mr. Garcia while they watched him experience a cardiac event, despite his known history of heart problems, obvious symptoms of medical crisis, and overt medical emergency in contravention of established practices and established standards of care.

146.    Defendant County of Los Angeles failed to appropriately hire, supervise, train, review, and ensure that its jail staff abided by the standard of care, failed to enact appropriate standards and procedures that would have prevented such harms to Mr. Garcia, including failing to train jail staff to promptly summon and/or render medical examination and treatment to inmate in need of medical treatment.

147.    Each of the Doe Defendants were both personally involved and aided and abetted in the violation of Mr. Garcia's rights. Each Doe Defendant was aware of the unlawful actions of the other Doe Defendants, did not object to these violations of Mr. Garcia's rights, participated in the violations, and gave substantial assistance and/or encouragement to the other Doe Defendants by refusing to provide or summon any

medical assessment or treatment for Mr. Garcia.

148.   As a direct result of Defendants' conduct, which included refusing to summon or provide prompt medical assessment and treatment to Mr. Garcia, Plaintiffs were injured.

149.   Defendant County of Los Angeles is vicariously liable for the actions of the Doe Defendants.

150.   The acts and failures to act as alleged herein caused severe anxiety, pain, suffering and emotional distress and injury to Plaintiffs, and Plaintiffs are therefore entitled to damages in an amount to be proven at trial.

151.   The aforementioned acts of the Doe Defendants were conducted with conscious disregard for the safety of Mr. Garcia and others, and were therefore malicious, wanton, and oppressive. As a result, those Defendants' actions justify an award of exemplary and punitive damages against the individual Defendants (but not the entity Defendant) to punish the wrongful conduct alleged herein and to deter such conduct in the future.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.      For compensatory, general, and special damages against each Defendant, jointly and severally, amounts to be proven at trial;

2.      Punitive and exemplary damages against Doe Defendants in an amount appropriate to punish Defendant(s) and deter others from engaging in similar misconduct;

3.      Prejudgment and post-judgment interest;

4.      For costs of suit and reasonable attorneys' fees and costs as authorized by statute or law;

5.      For restitution as the Court deems just and proper;

6.      For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper.

COMPLAINT FOR DAMAGES                    -36-

1

**DEMAND FOR JURY TRIAL**

2
Plaintiffs hereby demand trial by jury in this action.

3

4
Dated: March 26, 2024                    Respectfully Submitted,

5
HADSELL STORMER RENICK & DAI LLP

6

7
By:    /s/ Rebecca Brown

8
Dan Stormer
Brian Olney

9
Rebecca Brown
Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28